IN THE SUPREME COURT OF NORTH CAROLINA

 2022-NCSC-22

 No. 436PA13-4

 Filed 11 March 2022

I. BEVERLY LAKE, JOHN B. LEWIS, JR., EVERETTE M. LATTA, PORTER L.
MCATEER, ELIZABETH S. MCATEER, ROBERT C. HANES, BLAIR J.
CARPENTER, MARILYN L. FUTRELLE, FRANKLIN E. DAVIS, ESTATE OF
JAMES D. WILSON, ESTATE OF BENJAMIN E. FOUNTAIN, JR., FAYE IRIS
Y. FISHER, STEVE FRED BLANTON, HERBERT W. COOPER, ROBERT C.
HAYES, JR., STEPHEN B. JONES, MARCELLUS BUCHANAN, DAVID B.
BARNES, BARBARA J. CURRIE, CONNIE SAVELL, ROBERT B. KAISER,
JOAN ATWELL, ALICE P. NOBLES, BRUCE B. JARVIS, ROXANNA J. EVANS,
JEAN C. NARRON, and all others similarly situated

 v.
STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, a
corporation, formerly known as the North Carolina Teachers and State
Employees’ Comprehensive Major Medical Plan, TEACHERS’ AND STATE
EMPLOYEES’ RETIREMENT SYSTEM OF NORTH CAROLINA, a corporation,
BOARD OF TRUSTEES of the TEACHERS’ AND STATE EMPLOYEES’
RETIREMENT SYSTEM OF NORTH CAROLINA, a body politic and corporate,
DALE R. FOLWELL, in his official capacity as Treasurer of the State of North
Carolina, and the STATE OF NORTH CAROLINA

 On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

of the Court of Appeals, 264 N.C. App. 174 (2019), reversing and remanding an order

of summary judgment entered on 19 May 2017 by Judge Edwin G. Wilson, Jr. in

Superior Court, Gaston County. Heard in the Supreme Court on 4 October 2021.

 Gray, Layton, Kersh, Solomon, Furr & Smith, P.A. by Michael L. Carpenter,
 Christopher M. Whelchel, Marcus R. Carpenter, and Marshall P. Walker; Tin,
 Fulton, Walker & Owen, PLLC, by Sam McGee; and The Law Office of James
 Scott Farrin, by Gary W. Jackson and J. Bryan Boyd, for plaintiff-appellants.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, and
 Marc Bernstein, Special Deputy Attorney General, for defendant-appellees.

 The McGuinness Law Firm, by J. Michael McGuinness; and North Carolina
 Association of Educators, by Verlyn Chesson Porte, for amicus curiae North
 Carolina Association of Educators.

 The Sumwalt Group, by Vernon Sumwalt; and AARP Foundation, by Ali
 Naini, for amicus curiae AARP and AARP Foundation.

 EARLS, Justice.

¶1 In this case, a class of more than 220,000 former State employees (the Retirees)

 sued the State of North Carolina and various officials and agencies (the State) after

 the General Assembly enacted a statute that eliminated their option to remain

 enrolled in a premium-free preferred provider organization health insurance plan

 which allocated eighty percent of the costs of health care services to the insurer and

 twenty percent to the insured (the 80/20 PPO Plan). According to the Retirees, the

 State had undertaken a contractual—and thus constitutional—obligation to provide

 them with the option to remain enrolled in the 80/20 PPO Plan or one of equivalent

 value, on a noncontributory basis, for life. In response, the State argues that it never

 promised the Retirees the benefit of lifetime enrollment in any particular premium-

 free health insurance plan and that, even if it had done so, the noncontributory plan

 the State continues to offer provides the Retirees with a benefit of the same or greater

 value than the one available to them prior to 2011, when the statute eliminating the

 noncontributory 80/20 PPO Plan option was enacted (the 2011 Act).
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

¶2 The trial court agreed with the Retirees and entered partial summary

 judgement in their favor. A unanimous panel of the Court of Appeals reversed and

 remanded for entry of summary judgment in favor of the State. See Lake v. State

 Health Plan for Tchrs. & State Emps., 264 N.C. App. 174, 189 (2019). On

 discretionary review before this Court, we must answer a threshold question that

 divided the lower tribunals and which the parties vigorously contest: Did the State

 assume a contractual obligation to provide the Retirees the benefit of lifetime

 enrollment in the premium-free 80/20 PPO Plan or its substantive equivalent, such

 that the Retirees possessed a constitutionally protected vested right?

¶3 This Court has stated and reaffirmed that “[a] public employee has a right to

 expect that the retirement rights bargained for in exchange for his loyalty and

 continued services, and continually promised him over many years, will not be

 removed or diminished.” Bailey v. State, 348 N.C. 130, 141 (1998) (quoting Simpson

 v. N.C. Local Gov’t Emps.’ Ret. Sys., 88 N.C. App. 218, 224 (1987), aff’d per curiam,

 323 N.C. 362 (1988)). We have recognized that this right protects state employees’

 pensions and also encompasses other forms of benefits. See, e.g., N.C. Ass’n of

 Educators v. State, 368 N.C. 777 (2016) (NCAE) (holding that teachers possessed a

 protected right in their status as “career teachers”). It is understandable that the

 Retirees—who, before 2011, were eligible to remain enrolled in the 80/20 PPO Plan

 without paying a premium—would perceive being required to pay a premium to
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 remain enrolled in the 80/20 PPO Plan as diminishing their bargained-for rights. For

 the reasons explained below, we agree with the trial court that the Retirees enjoyed

 a constitutionally protected vested right in remaining enrolled in the 80/20 PPO Plan

 or its substantive equivalent on a noncontributory basis.

¶4 Nonetheless, the Retirees are entitled to receive only the benefit of the bargain

 they struck with the State and nothing more. To prevail on their claims arising under

 Article I, Section 10 of the United States Constitution (the Contracts Clause), the

 Retirees must also demonstrate that the General Assembly “substantially impaired”

 their contractual rights when it eliminated the option of enrolling in the premium-

 free 80/20 PPO Plan. Bailey, 348 N.C. at 151. And even if the Retirees meet this

 burden, the State must be afforded the opportunity to show that the impairment was

 “reasonable and necessary to serve an important public purpose” and was thus not in

 violation of the Contracts Clause. Id. at 141 (citing U.S. Tr. Co. of N.Y. v. New Jersey

 (U.S. Trust), 431 U.S. 1 (1977)).

¶5 These latter two questions—whether a contract has been “substantially

 impaired” and whether any such impairment is “reasonable and necessary”—are

 particularly fact-intensive. Answering them requires a careful examination of the

 plans made available to the Retirees when their respective rights to health insurance

 coverage vested and a comparison of those plans to the ones the State currently offers.

 Although the 2011 Act plainly requires the Retirees to pay a premium to remain
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 enrolled in a plan previously offered on a noncontributory basis, many variables

 besides a premium—such as the size of a plan member’s deductibles and co-pays, and

 the scope of coverage the plan affords—affect the value of a health insurance plan.

 Furthermore, in a rapidly changing world of dramatic medical advances and

 evolutions in how health care is financed, including changes to the State’s overall

 health insurance offerings that provide new options for retired state employees, it

 would be unreasonable to expect that the State would maintain the precise terms of

 the plans it offered in an entirely different era.

¶6 Accordingly, we hold that the trial court correctly determined there were no

 genuine issues of material fact relating to whether the Retirees possessed a vested

 right protected under the Contracts Clause. The trial court correctly concluded that

 the Retirees had obtained such a right. Therefore, the Court of Appeals erred in

 concluding that the Retirees possessed no vested rights within the meaning of the

 Contracts Clause. But numerous genuine issues of material fact needed to be resolved

 in order to answer the latter two questions—whether the 2011 Act worked a

 substantial impairment of the Retirees’ vested rights and whether any such

 impairment was reasonable and necessary. Thus, the trial court erred in summarily

 concluding as a matter of law on the record before it that the General Assembly

 violated the Retirees’ state or federal constitutional rights. Accordingly, we affirm the

 Court of Appeals’ decision to reverse the trial court’s grant of partial summary
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 judgment in favor of the Retirees, reverse the Court of Appeals’ decision to remand

 this case for entry of summary judgment in favor of the State, and remand this matter

 to the trial court for further proceedings not inconsistent with this opinion, including

 our holding that the Retirees possess a vested right.

 I. Background

 A. Health insurance benefits for retired state employees.

¶7 In 1972, the State of North Carolina began offering all state employees and

 retirees the opportunity to enroll in a health insurance plan. Act of July 20, 1971, ch.

 1009, 1971 N.C. Sess. Laws 1588. Initially, the State provided coverage via group

 insurance contracts it purchased on its employees’ behalf. Id. § 1 at 1588. In 1982 the

 General Assembly altered this approach when it established a “Comprehensive Major

 Medical Plan” offered directly by the State. Act of June 23, 1982, ch. 1398, § 6, 1981

 N.C. Sess. Laws (Reg. Sess. 1982) 288, 289-311 (Establishing Act). The Establishing

 Act codified the Major Medical Plan’s terms of coverage and provided that members

 would be “eligible for coverage under the Plan[ ] on a noncontributory basis.” Id. at

 295. The plan was to be overseen by a Board of Trustees housed within the Office of

 State Budget and Management, id. at 298 (enacting N.C.G.S. § 135-39 (1982)), who

 were directed to contract with and supervise an outside entity selected by the State

 Budget Officer to serve as the Plan Administrator, id. at 290-91 (enacting N.C.G.S.

 §§ 135-39.4 to -39.5A (1982)). A few years later, the General Assembly enacted
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 another statute providing that, going forward, retired employees would need to have

 been employed by the State for at least five years before becoming eligible to receive

 benefits under the Major Medical Plan. Act of Aug. 14, 1987, ch. 857, § 9, 1987 N.C.

 Sess. Laws 2098, 2101.

¶8 In 2005 the General Assembly enacted a law providing state employees and

 retirees with the option of enrolling in various PPO plans, while continuing to offer

 the option of enrolling in the Major Medical Plan. Act of Aug. 13, 2005, ch. 276

 § 29.33(a), 2005 N.C. Sess. Laws 1003. The General Assembly also increased the

 eligibility requirements for new hires to participate in noncontributory retirement

 health insurance plans from five years of service to twenty years, although the change

 was only made applicable prospectively. S.L. 2006-174, § 1, 2005 N.C. Sess. Laws

 (Reg. Sess. 2006) 630, 630. Effective in 2008, the State discontinued the Major

 Medical Plan it had offered since 1982 and replaced it with a State Health Plan for

 Teachers and State Employees. Current Operations and Capital Improvements

 Appropriations Act of 2007, S.L. 2007-323, § 28.22A(a)-(b), 2007 N.C. Sess. Laws 616,

 892. By this time, the State was also offering two premium-free PPO plans—the 80/20

 PPO Plan1 and a 70/30 PPO Plan.

 1 The Retirees refer to the Major Medical Plan as the “Regular State Health Plan” and

 contend that the premium-free 80/20 PPO Plan was its “continuation.” Put another way, they
 argue that the State satisfied its obligation to offer a premium-free health insurance plan of
 equivalent value to the initial Major Medical Plan (or Regular State Health Plan) until the
 General Assembly eliminated the option of enrolling in the premium-free 80/20 PPO Plan.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

¶9 In 2011, the General Assembly authorized the State Health Plan2 to charge

 employees and retirees a monthly premium to enroll in the 80/20 PPO Plan. S.L.

 2011-85, § 1.2(a), 2011 N.C. Sess. Laws 119, 120 (the 2011 Act). The General

 Assembly did not eliminate the option for retirees to enroll in a noncontributory

 health insurance plan—the State continued to offer retirees the option of

 participating in the premium-free 70/30 PPO Plan. However, retirees who had

 previously been enrolled in the premium-free 80/20 PPO Plan were required to either

 pay a premium to remain in their same plan or choose a different premium-free plan

 containing different terms and, the Retirees assert, offering a less valuable benefit.

 See id.

 B. Trial court proceedings.

¶ 10 In response to the 2011 Act, the Retirees filed suit on behalf of themselves and

 all other similarly situated former state employees against the State Health Plan for

 Teachers and State Employees, the Teachers’ and State Employees’ Retirement

 System and its trustees, the State Treasurer, and the State of North Carolina. They

 alleged claims for breach of contract, unconstitutional impairment of contracts in

 violation of the Contracts Clause, and unconstitutional violation of their rights to due

 process and equal protection under article I, section 19 of the North Carolina

 2 The phrase “the State Health Plan” refers both to the package of health benefits

 offered to State employees and retirees and to the agency that manages those benefits.
 See N.C.G.S. § 135-48.1(14) (2021).
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 Constitution (the Law of the Land Clause). They sought (1) a writ of mandamus

 requiring the State to “reinstate and continue” the premium-free 80/20 PPO Plan for

 all class members, or a preliminary and permanent injunction requiring the same;

 (2) declaratory relief; and (3) the creation of a trust or common fund for the payment

 of damages. The State initially moved to dismiss the complaint on the basis of

 sovereign immunity. After the trial court denied that motion, the State appealed. The

 Court of Appeals affirmed, holding that the Retirees “sufficiently alleged a valid

 contract between them and the State in their complaint to waive the defense of

 sovereign immunity.” Lake v. State Health Plan for Tchrs. & State Emps., 234 N.C.

 App. 368, 375 (2014).

¶ 11 On remand, the trial court certified a class composed of:

 (1) All members (or their Estates or personal
 representatives if they have deceased since July 1, 2009) of
 the N.C. Teachers’ and State Employees’ Retirement
 System (“TSERS”) who retired before January 1, 1988; (2)
 TSERS members (or their Estates or personal
 representatives if they have deceased since July 1, 2009)
 who retired on or after January 1, 1988, were hired before
 October 1, 2006 and have 5 or more years of contributory
 service with the State and (3) surviving spouses (or their
 Estates or personal representatives if they have deceased
 since July 1, 2009) of (i) deceased retired employees,
 provided the death of the former plan member occurred
 prior to October 1, 1986; and (ii) deceased teachers, State
 employees, and members of the General Assembly who are
 receiving a survivor’s alternate benefit under any of the
 State-supported retirement programs, provided the death
 of the former plan member occurred prior to October 1,
 1986
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 All class members were either former employees who had become eligible to enroll in

 a premium-free State health insurance plan upon retirement because they satisfied

 the eligibility requirements in existence when they were hired or those deceased

 employees’ beneficiaries.3 The parties proceeded to discovery.

¶ 12 On 14 September 2016, the Retirees filed a motion for partial summary

 judgment. They alleged that “[t]he [State’s] own documents and testimony prove that

 they offered the Retiree Health Benefit as a lifetime contractual benefit ‘earned’

 through a defined period of employment service.” In support of their motion, the

 Retirees relied on depositions of class members as well as former State benefits

 counselors, the Executive Director and Deputy Director for the State Health Plan,

 the Director of the Fiscal Research Division of the North Carolina General Assembly

 and its pension analyst, the Deputy Director of Operations for the State Retirement

 System, actuaries for the State Health Plan, a representative of the health insurance

 plan administrator (Blue Cross Blue Shield of North Carolina), and the then-serving

 elected North Carolina State Treasurer. They also relied on statements in legislation

 governing the State Health Plan, press releases pertaining to the State Health Plan,

 3 Notably, the class only includes retirees who would have satisfied the eligibility

 requirements for enrolling in the premium-free Major Medical Plan or subsequent 80/20 PPO
 Plan prior to the 2011 Act taking effect. This case only addresses changes applied
 retroactively to the health insurance options available to retirees already eligible to enroll in
 the plan the 2011 Act eliminated. The Retirees do not challenge the State’s authority to
 change its employment benefit offerings prospectively.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 training manuals used by customer service personnel to advise State employees and

 retirees, benefits handbooks provided to State employees and retirees, and

 presentations regarding the State Health Plan’s fiscal outlook.

¶ 13 The undisputed evidence elicited from these sources and presented in support

 of the Retirees’ summary judgment motion included descriptions of retirement health

 insurance coverage as a part of their “total package of compensation”; explanations

 that employees would become eligible for “noncontributory (no cost to you)” health

 insurance coverage upon retirement and “for life” after working for the State for at

 least five years; statements that employees would be eligible for retiree health

 coverage “for life” when they “vested”; descriptions of the State’s “liability” arising

 from its ongoing “obligation” to continue paying the premiums for retirees who had

 “already earned” the right to enroll in the State Health Plan on a noncontributory

 basis; and class members’ own statements that they relied on the promise of lifetime

 enrollment in a premium-free health insurance plan when deciding to accept or

 continue in employment with the State.

¶ 14 In response, the State filed its own motion for summary judgment as to liability

 in which it argued that the evidence presented by the Retirees demonstrated that

 “[t]he State never undertook, nor was any state agency authorized, to offer Plaintiffs

 any such contracts. . . . that would lock-in any terms of the [State Health] Plan for

 fifty-plus years into the future.” The State further contended that even if the Retirees
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 had established the existence of some contractual right to remain enrolled in a health

 insurance plan of a particular value, the Retirees’ assertion that the premium-free

 70/30 PPO Plan was substantially less valuable than the premium-free 80/20 PPO

 Plan “fail[ed] to address the terms of a complete and enforceable contract for

 healthcare benefits,” given that “[c]oinsurance is one of many healthcare terms and

 it accounts for only a fraction of healthcare costs.”

¶ 15 On 19 May 2017, the trial court entered an Order Granting Plaintiffs’ Motion

 for Partial Summary Judgment and Denying Defendants’ Motion for Summary

 Judgment as to Liability. The trial court found as a factual matter that the State had

 promised its employees the benefit of enrolling in a plan at least as valuable as the

 premium-free 80/20 PPO Plan as part of their overall compensation package, that

 these employees relied on this promise, and that the promised benefit formed “a part

 of the contract between Class Members and the Defendants.” Accordingly, the trial

 court determined that the Retirees’ employment contracts with the State gave rise to

 “an entitlement to a non-contributory (premium-free) health plan equivalent to the

 80/20 regular state health plan that had long been offered and provided to Class

 Members.” The trial court further concluded that the 2011 Act eliminating the

 premium-free 80/20 PPO Plan “substantially impaired the[se] contracts” because the

 only noncontributory option thereafter available to the Retirees was the 70/30 PPO

 Plan. Finally, the court concluded that the State’s action “was neither reasonable nor
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 necessary to serve an important public purpose.” As a result, the trial court concluded

 that the 2011 Act violated both the federal Contracts Clause and the state Law of the

 Land Clause. The State again appealed.

 C. The Court of Appeals’ decision.

¶ 16 On appeal, the Court of Appeals unanimously reversed and remanded for the

 entry of summary judgment in favor of the State. Lake v. State Health Plan for Tchrs.

 & State Emps., 264 N.C. App. 174 (2019).

¶ 17 The Court of Appeals began with the Retirees’ claim that the 2011 Act violated

 the Contracts Clause, which provides in relevant part that “[n]o State shall . . . pass

 any . . . Law impairing the Obligation of Contracts.” U.S. Const. art. I, § 10. According

 to the Court of Appeals, Contracts Clause claims are governed by a three-part test

 articulated by the United States Supreme Court in United States Trust Co. of New

 York v. New Jersey (U.S. Trust), 431 U.S. 1 (1977), and subsequently adopted by this

 Court. Under the U.S. Trust test, a court must “ascertain: (1) whether a contractual

 obligation is present, (2) whether the state's actions impaired that contract, and

 (3) whether the impairment was reasonable and necessary to serve an important

 public purpose.” Lake, 264 N.C. App. at 179–80 (quoting Bailey, 348 N.C. at 141). The

 Court of Appeals concluded that the Retirees’ claims failed the first prong of the U.S.

 Trust test: they could not demonstrate that the State had undertaken a “specific

 contractual financial obligation” to continue providing the 80/20 PPO Plan on a
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 noncontributory basis. Id. at 189.

¶ 18 To determine if any contractual right existed, the Court of Appeals compared

 the Retirees’ asserted right to health insurance coverage with the pension benefits

 this Court held protected by the Contracts Clause in Bailey. According to the Court

 of Appeals, pension benefits were granted the status of a constitutionally protected

 “vested contractual right because they were a form of ‘deferred compensation.’ ” Id.

 at 181 (quoting Bailey, 348 N.C. at 141). By contrast, the “benefit” of being eligible to

 enroll in a particular health insurance plan was categorically different. Whereas

 pension benefits are funded through “mandatory” deductions “from the employee’s

 paycheck” and are “calculated based upon the employee’s salary and length of

 service,” state employees “are not required to” contribute anything to become eligible

 to enroll in a premium-free health insurance plan. Id. at 182. Additionally, “the level

 of retirement health care benefits is not dependent upon an employee’s position,

 retirement plan, salary, or length of service. All eligible participants, active and

 retired, have equal access to the same choices in health care plans.” Id. Thus, health

 insurance benefits and pension benefits are “[n]ot [a]nalogous.” Id. at 181.

¶ 19 The Court of Appeals next examined the statutes governing the State Health

 Plan to determine if the General Assembly had evinced an express intent to

 undertake a contractual obligation. The Court of Appeals noted that “[t]he statutes

 governing the State Health Plan do not refer to a ‘contract’ between the employees
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 and the State,” even though “[t]he term ‘contract’ is used in the statute to describe

 the relationship between the State Health Plan and its service providers.” Id. at 185.

 Moreover, the Court of Appeals found it salient that the General Assembly had, on

 numerous occasions, exercised its statutorily reserved right to “alter” the State

 Health Plan by changing its terms, which the court concluded “support[s] a holding

 that the establishment and maintenance of the North Carolina State Health Plan is

 a legislative policy, which is ‘expressly and, inherently subject to revision and repeal’

 by the General Assembly.” Id. at 187 (quoting Nat’l R.R. Passenger Corp. v. Atchison,

 Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466 (1985)). The Court of Appeals concluded

 that the Retirees had failed to overcome the “presumption” against construing

 statutes “to create contractual rights in the absence of an expression of unequivocal

 intent.” Id. at 180–81.

¶ 20 The Court of Appeals also rejected the Retirees’ effort to prove the State’s

 intent to contract by looking to statements in “pamphlets, distributed by the State to

 its employees to explain the retirement benefits.” Id. at 185. The Court of Appeals

 stated that this kind of extrinsic evidence was relevant only in cases involving

 “mandatory and contributory retirement benefits.” Id. It reasoned that the General

 Assembly’s “use of contractual language in the statute in reference to service

 providers indicates the General Assembly specified situations and knew when to use

 the word ‘contract,’ and it did not intend to form a contractual relationship between
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 the State and its employees related to health care insurance benefits.” Id. at 186.

¶ 21 Having concluded that the Retirees had failed to demonstrate the existence of

 any vested right in a premium-free 80/20 PPO Plan or its substantive equivalent, the

 Court of Appeals determined that the Retirees’ Contracts Clause argument

 necessarily failed. Id. at 188. For the same reason, the Court of Appeals overruled the

 trial court’s conclusion that the 2011 Act “violated Article I, section 19 of the

 Constitution [by] tak[ing] Plaintiffs’ private property without just compensation. . . .

 Without a valid contract, Plaintiffs’ state constitutional claims also fail.” Id. (citing

 Adams v. State, 248 N.C. App. 463, 469–70 (2016), disc. rev. denied, 370 N.C. 80

 (2017)). Accordingly, the court “reverse[d] the grant of partial summary judgment

 and remand[ed] for entry of summary judgment in favor of Defendants and dismissal

 of Plaintiffs’ complaint.” Id. at 189.

¶ 22 Plaintiffs filed a Petition for Discretionary Review and Writ of Certiorari on

 9 April 2019. This Court allowed discretionary review in an order dated 26 February

 2020.4

 4 By order dated 18 August 2021 this Court, mindful of the quorum requirement of

 N.C.G.S. § 7A-10(a), invoked the Rule of Necessity to decide this matter in light of the fact
 that a majority of the members of the Court have one or more persons within the third degree
 of kinship by blood or marriage not residing in their households who could be plaintiff class
 members. See, e.g., Boyce & Isley, PLLC v. Cooper, 357 N.C. 655, 655–56 (2003) (invoking
 the Rule of Necessity to permit the making of a decision to grant or deny a petition for
 discretionary review in an important case by more than a bare quorum of the Court); Long v.
 Watts, 183 N.C. 99, 102–03 (1922) (determining that the Court must hear a case challenging
 the application of a statewide income tax to judicial salaries despite the potential effect of
 that case upon the members of the Court).
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 II. Standard of Review

¶ 23 “When the party bringing the cause of action moves for summary judgment, he

 must establish that all of the facts on all of the essential elements of his claim are in

 his favor. . . .” Steel Creek Dev. Corp. v. James, 300 N.C. 631, 637 (1980). The movant

 “must show that there are no genuine issues of fact; that there are no gaps in his

 proof; that no inferences inconsistent with his recovery arise from his evidence; and

 that there is no standard that must be applied to the facts by the jury.” Kidd v. Early,

 289 N.C. 343, 370 (1976). This Court reviews a grant of summary judgment de novo.

 Charlotte-Mecklenburg Hosp. Auth. v. Talford, 366 N.C. 43, 47 (2012). In undertaking

 de novo review, we consider the affidavits, depositions, exhibits, and other

 submissions of the parties to determine if the material facts are uncontested and

 whether there is a genuine issue for trial. See, e.g., Dobson v. Harris, 352 N.C. 77, 83

 (2000) (citing Koontz v. City of Winston-Salem, 280 N.C. 513, 518 (1972)).

¶ 24 In this case both parties moved for summary judgment on the merits.

 Nevertheless, as we explained in Dobson,

 [s]ummary judgment is properly granted when the forecast
 of evidence reveals no genuine issue as to any material fact,
 and when the moving party is entitled to a judgment as a
 matter of law. . . . The movant’s papers are carefully
 scrutinized . . . those of the adverse party are indulgently
 regarded. All facts asserted by the adverse party are taken
 as true, and their inferences must be viewed in the light
 most favorable to that party.

 352 N.C. at 83 (cleaned up). Thus, even though both parties in this case asserted that
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 there were no disputes of material fact and that they were entitled to judgment as a

 matter of law, if our review of the evidence submitted at summary judgment reveals

 a genuine material factual dispute, we must remand to the trial court. See Forbis v.

 Neal, 361 N.C. 519, 530–31 (2007) (remanding after review of cross-motions for

 summary judgment).

 III. The Federal Contracts Clause Claim

¶ 25 The Court of Appeals correctly stated the legal framework applicable to claims

 arising under the Contracts Clause of the United States Constitution. As we have

 explained, when “determining whether a contractual right has been

 unconstitutionally impaired, we are guided by the three-part test set forth in U.S.

 Trust Co. of N.Y. v. New Jersey.” Bailey, 348 N.C. at 140. This test requires us to

 “ascertain: (1) whether a contractual obligation is present, (2) whether the state's

 actions impaired that contract, and (3) whether the impairment was reasonable and

 necessary to serve an important public purpose.” Id. at 141. An impairment only

 implicates the Contracts Clause if it is “substantial” as opposed to “[m]inimal.” Id. at

 151 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244–45 (1978)).

 We apply this familiar “tripartite test” in analyzing the Retirees’ claim. Simpson v.

 N.C. Local Gov’t Emps.’ Ret. Sys., 88 N.C. App. 216, 224 (1987), aff’d per curiam, 323

 N.C. 362 (1988).
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 A. Relevant North Carolina precedents interpreting and applying the U.S.
 Trust test.

¶ 26 This Court has interpreted and applied the U.S. Trust test to determine

 whether state employees or retirees possessed a vested right to an employment

 benefit on numerous occasions. At its core, this case centers on the proper

 interpretation of four of those cases: Simpson v. North Carolina Local Government

 Employees’ Retirement System, 88 N.C. App. 218 (1987), aff’d per curiam, 323 N.C.

 362 (1988); Faulkenbury v. Teachers’ & State Employees’ Retirement System of North

 Carolina, 345 N.C. 683 (1997), Bailey v. State, 348 N.C. 130 (1998), and North

 Carolina Association of Educators v. State (NCAE), 368 N.C. 777 (2016) (NCAE).

 According to the Retirees, these cases establish a universal framework for assessing

 when state employees obtain a vested right in any kind of employment benefit.

 According to the State, these cases explain why statutes providing pension benefits

 create vested rights; however, the State asserts that the reasons justifying this

 Court’s treatment of pension benefits do not pertain to the kind of claimed health

 insurance benefits at issue here.

¶ 27 We agree with the Retirees, to an extent. Collectively, Simpson, Faulkenbury,

 Bailey, and NCAE establish that a state employee can obtain a vested right in an

 employment benefit that is not a pension and that treatment of a benefit as a

 contractual right does not depend on how closely that benefit resembles a pension.

 These cases further illustrate that the State may assume a contractual obligation to
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 provide a benefit even if the statute creating the benefit “did not itself create any

 vested contractual rights.” NCAE, 368 N.C. at 789. Because many of the issues in this

 case were examined in these four prior cases, we begin with a brief review of these

 precedents.

 1. Simpson v. Local Government Employees’ Retirement System.

¶ 28 In Simpson, two firefighters who were vested members of the North Carolina

 Local Governmental Employees’ Retirement System challenged a law modifying how

 disability retirement benefits were calculated. 88 N.C. App. at 219–21. As a result of

 the General Assembly’s actions, the firefighters would “receive, upon disablement

 after vesting, a smaller retirement allowance under the modified statute than under

 prior law.” Id. at 220. The firefighters claimed that the decrease “constitute[d] an

 impairment of contractual rights” in violation of the Contracts Clause of the United

 States Constitution. Id. at 221. The Court of Appeals agreed, and this Court affirmed

 per curiam.

¶ 29 According to the Court of Appeals, “the relationship between plaintiffs and the

 Retirement System is one of contract.” Id. at 223. In support of this holding, the Court

 of Appeals identified two related but distinct justifications for characterizing the

 plaintiffs’ disability benefits as vested contractual rights:

 If a pension is but deferred compensation, already in effect
 earned, merely transubstantiated over time into a
 retirement allowance, then an employee has contractual
 rights to it. The agreement to defer the compensation is the
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 contract. Fundamental fairness also dictates this result. A
 public employee has a right to expect that the retirement
 rights bargained for in exchange for his loyalty and
 continued services, and continually promised him over
 many years, will not be removed or diminished.

 Id. at 223–24 (emphasis added). The firefighters had vested rights in their pension

 benefits because (1) they earned the benefits as compensation while they were

 working and deferred receipt until retirement, and (2) the promise of disability

 retirement benefits allocated in a particular way was part of the bargain they struck

 with the State when they entered into an employment contract. Id. Notably, the Court

 of Appeals pointedly rejected the State’s argument that the General Assembly’s

 inclusion of a “right-to-amend” clause in the statute providing benefits to the

 firefighters defeated the firefighters’ claim.5 Id. at 221.

¶ 30 Next, without analysis, the Court of Appeals concluded that the challenged law

 substantially impaired the firefighters’ vested rights “inasmuch as plaintiffs stand to

 suffer significant reductions in their retirement allowances as a result of the

 legislative amendment under challenge.” Id. at 225. But the Court of Appeals

 concluded that a “genuine issue[ ] [remained] as to a[ ] material fact in this action,”

 namely, whether the State had demonstrated that the legislative changes to the

 5 For reasons explained more fully below, given the fact that Simpson established that

 a statutory provision containing a right-to-amend clause could give rise to contractual
 benefits, it was not unreasonable for the Retirees to believe that the statutory provisions
 granting retirement health insurance coverage could give rise to contractual benefits
 notwithstanding the legislature’s inclusion of a right-to-amend clause.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 retirement plan were “reasonable and necessary to serve an important state interest.”

 Id. at 226. Accordingly, the Court of Appeals held that summary judgment for the

 State had been “improvidently entered” and remanded the case to the trial court for

 further proceedings. Id.

 2. Faulkenbury v. Teachers’ & State Employees’ Retirement System of
 North Carolina.

¶ 31 In Faulkenbury we considered whether a statute “which reduced plaintiffs’

 disability retirement payments[ ] violates Article I, Section 10 of the Constitution of

 the United States.” 345 N.C. at 690. Noting that the case was “almost on all fours

 with” Simpson, we affirmed “that the relation between the employees and the

 governmental units was contractual.” Id. Because “[a]t the time the plaintiffs’ rights

 to pensions became vested, the law provided that they would have disability

 retirement benefits calculated in a certain way,” we concluded that “[t]hese were

 rights [the plaintiffs] had earned and that may not be taken from them by legislative

 action.” Id.

¶ 32 After declining the defendants’ invitation to overrule Simpson, we considered

 and rejected various arguments purporting to explain why the plaintiffs lacked a

 contractual right in disability benefits calculated in the manner provided at the time

 their benefits vested. We expressly rejected the argument that the plaintiffs’ rights

 were not contractual because “the statutes upon which the plaintiffs rely . . . only

 state a policy which the General Assembly may change.” Id. Instead, we concluded
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 that these statutes “provided what the plaintiffs’ compensation in the way of

 retirement benefits would be” at the time the plaintiffs “started working for the

 state.” Id. Thus, when the plaintiffs accepted their offers of employment and

 subsequently vested in the retirement system, the statutes outlining disability

 benefits became part of their contracts. Id.

¶ 33 We reached this conclusion notwithstanding our recognition that “nothing in

 the statutes” indicated the General Assembly “intended to offer the benefits as a part

 of a contract.” Id. at 691. Instead of restricting our analysis to the four corners of the

 statute, we considered how a reasonable person offered employment with the State

 would interpret what the benefits provided by the statute represented:

 [W]hen the General Assembly enacted laws which provided
 for certain benefits to those persons who were to be
 employed by the state and local governments and who
 fulfilled certain conditions, this could reasonably be
 considered by those persons as offers by the state or local
 government to guarantee the benefits if those persons
 fulfilled the conditions. When they did so, the contract was
 formed.

 Id. We concluded it was reasonable for a prospective employee to believe the statutes

 providing retirement disability benefits were part of the compensation package

 promised, even though these statutes provided that the General Assembly “reserved

 the right to amend the retirement plans for state and local government employees.”

 Id.

¶ 34 Regarding the second prong of the U.S. Trust test, we reasoned that even if
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 other changes to the plaintiffs’ overall retirement benefits meant they were “receiving

 more than any reasonable expectation they had for disability benefits,” the plaintiffs

 were “entitled to what they bargained for when they accepted employment with the

 state and local governments. They should not be required to accept a reduction in

 benefits for other benefits they have received.” Id. at 693. Regarding the third prong,

 we rejected the defendants’ argument that the changes were “reasonable and

 necessary to accomplish [the] important public purpose” of discouraging employees

 from “tak[ing] early retirement.” Id. at 693–94. Accordingly, we held that the statute

 changing how retirement benefits were calculated violated the Contracts Clause. Id.

 at 694.

 3. Bailey v. State.

¶ 35 In Bailey a class of state and local government employees challenged a state

 law capping the amount of retirement benefits that were exempted from state

 taxation at $4,000. 348 N.C. at 139. Prior to the law, all benefits paid out to retirees

 under any state or local retirement system were entirely tax-exempt. Id. Every

 member of the class had “ ‘vested’ in the retirement system” before the law took effect,

 meaning they had met “the requirement that employees work a predetermined

 amount of time in public service before [becoming] eligible for retirement benefits.”

 Id. at 138. Ultimately, we agreed with the plaintiffs that they had “a contractual right

 to an exemption of their benefits from state taxation that has been impaired by the
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 Act.” Id. at 139.

¶ 36 Once again, the defendants invited this Court to overrule Simpson. Once again,

 we declined. Id. at 142 (“[T]he contractual relationship approach taken by the Court

 of Appeals in Simpson and our subsequent decisions is the proper one.”). Instead, we

 affirmed the underlying principle that North Carolina law has “long demonstrated a

 respect for the sanctity of private and public obligations from subsequent legislative

 infringement.” Id. We explained that “[t]his respect for individual rights has

 manifested itself through the expansion of situations in which courts have held

 contractual relationships to exist, and in which they have held these contracts to have

 been impaired by subsequent state legislation.” Id. at 143. We noted that this

 principle has been extended to cases protecting vested rights that were not created

 by statute. Id. at 144 (citing Pritchard v. Elizabeth City, 81 N.C. App. 543, disc. rev.

 denied, 318 N.C. 417 (1986)). Indeed, we explained that “[t]he basis of the contractual

 relationship determinations in these and related cases is the principle that where a

 party in entering an obligation relies on the State, he or she obtains vested rights that

 cannot be diminished by subsequent state action.” Id. (emphasis added). The

 employees’ “expectational interests upon which [they] have relied through their

 actions” in entering into and maintaining employment with the State were the source

 of the vested right “safeguarded by the Contract Clause protection.” Id. at 144–45.

¶ 37 With respect to the first prong of the U.S. Trust test, we framed the question
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 as “whether the tax exemption was a condition or term included in the retirement

 contract.” Id. at 146. We found dispositive the trial court’s finding of fact that “[a]

 reasonable person would have concluded from the totality of the circumstances and

 communications made to plaintiff class members that the tax exemption was a term

 of the retirement benefits offered in exchange for public service to state and local

 governments.” Id. Moreover, we concluded that this finding was amply supported by

 the evidence produced at trial, including the

 creation of various statutory tax exemptions by the
 legislature, the location of those provisions alongside the
 other statutorily created benefit terms instead of within
 the general income tax code, the frequency of governmental
 contract making, communication of the exemption by
 governmental agents in both written and oral form, use of
 the exemption as inducement for employment, mandatory
 participation, reduction of periodic wages by contribution
 amount (evidencing compensation), loss of interest for
 those not vesting, establishment of a set time period for
 vesting, and the reliance of employees upon retirement
 compensation in exchange for their services.

 Id. Based on this finding and the supporting evidence, we concluded that “in exchange

 for the inducement to and retention in employment, the State agreed to exempt from

 state taxation benefits derived from employees’ retirement plans.” Id. at 150. This

 was a sufficient basis for us to hold that “the right to benefits exempt from state

 taxation is a term of [every eligible State employee’s] contract” with the State. Id.

¶ 38 After rejecting the defendants’ arguments that other statutes and

 constitutional provisions forbade the State from entering into a contract to provide a
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

tax exemption, we held that the plaintiffs had also satisfied the second and third

prongs of the U.S. Trust test. With respect to the second prong, we concluded that the

imposition of a $4,000 annual exemption cap—which would produce “losses to retirees

in expected income . . . in excess of $100 million”—was a substantial impairment of

the employees’ contractual right to tax-exempt retirement benefits. Id. at 151. With

respect to the third prong, we rejected the State’s effort to justify the $4,000 cap as a

“reasonable and necessary” means to equalize the tax treatment of state and federal

retirement benefits, as was required under a recent United States Supreme Court

decision. Id. at 152 (citing Davis v. Mich. Dep’t of Treasury, 489 U.S. 803 (1989)). We

held that the $4,000 cap “was not necessary to achieve the state interest asserted”

because the State could have equalized the tax treatment of state and federal

retirement benefits in “numerous ways . . . without impairing the contractual

obligations of plaintiffs.” Id. (emphasis added). We held that the impairment was “not

reasonable under the circumstances” merely because the impairment would allow the

General Assembly to comply with Davis by enacting “revenue neutral” legislation. Id.

(emphasis added). Accordingly, we concluded that the law capping state retirement

benefits tax exemptions for the plaintiffs violated the Contracts Clause of the United

States Constitution and was an impermissible taking under the Law of the Land

Clause of the North Carolina Constitution.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 4. North Carolina Association of Educators v. State.

¶ 39 Finally, in NCAE a class of North Carolina public school teachers claimed that

 the General Assembly violated both the Contracts Clause and the Law of the Land

 Clause when it enacted a statute eliminating North Carolina’s career status system,

 “creat[ing] a new system of employment,” and “retroactively revok[ing] the career

 status of teachers who had already earned that designation.” 368 N.C. at 779. Under

 the career status system, teachers who had been employed for a statutorily fixed

 number of years became eligible to enter into a “career teacher” contract with the

 teacher’s local school board; having attained career status, the teacher would “no

 longer [be] subject to an annual appointment process and could only be dismissed for

 . . . grounds specified [by] statute.” Id. (internal citation omitted). This Court

 concluded that the law eliminating career status was unconstitutional “to the extent

 that the Act retroactively applies to teachers who had attained career status as of”

 the date the change took effect. Id.

¶ 40 Once again, the Court turned to the three-prong U.S. Trust test. To determine

 if the State had undertaken a contractual obligation to maintain the career status

 system, the Court first considered “whether any contractual obligation arose from the

 statute making up the now-repealed Career Status Law.” Id. at 786. Noting the

 “presumption” against construing state statutes to create private contractual or

 vested rights, id., the Court concluded that the law itself was not the source of any
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 such rights, id. at 788. In reaching this conclusion, the Court found it “critical” that

 the legislature had chosen not to use the word contract in the Career Status Law. Id.

 at 787.

¶ 41 Nonetheless, the Court explained that there were other ways to prove the

 existence of a vested right. The first was through a statute providing benefits in the

 form of deferred compensation. In these circumstances “vested contractual rights

 were created by the statutes at issue because, at the moment the plaintiffs fulfilled

 the conditions set out in the two benefits programs, the plaintiffs earned those

 benefits.” Id. at 788. This scenario did not describe the statutes creating the career

 status system because teachers who met the eligibility requirements for becoming a

 career teacher did not automatically become a career teacher; rather, they needed to

 “enter a career contract with the school board.” Id. Accordingly, the Court held that

 “the Career Status Law did not itself create any vested contractual rights.” Id. at 789.

¶ 42 Yet the Court’s analysis “d[id] not end here.” Id. Instead, the Court explained

 that “[l]aws which subsist at the time and place of the making of a contract . . . enter

 into and form a part of it, as if they were expressly referred to or incorporated in its

 terms.” Id. at 789 (second alteration in original) (quoting Home Bldg. & Loan Ass’n

 v. Blaisdell, 290 U.S. 398, 429–30 (1934)). When teachers entered into contracts with

 local school boards to become career teachers, the “statutory system that was in the

 background of the contract between the teacher and the board set out the mechanism
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 through which the teachers could obtain career status.” Id. After the teacher

 “complet[ed] several consecutive years as a probationary teacher and then receiv[ed]

 approval from the school board,” the teacher’s contractual right to career status

 protections “vested.” Id. “At that point, the General Assembly no longer could take

 away that vested right retroactively in a way that would substantially impair it.” Id.

 Thus, we concluded that “vesting stems not from the Career Status Law, but from

 the teacher’s entry into an individual contract with the local school system.” Id.

¶ 43 In support of this conclusion, the Court relied on evidence in the record

 indicating that the opportunity to attain career status was offered to teachers as part

 of the compensation package used to attract them to public sector employment and

 that teachers considered the benefit to be an important incentive to remain in their

 positions. Id. (stating that the record “demonstrates the importance of those

 protections to the parties and the teachers’ reliance upon those benefits in deciding

 to take employment as a public school teacher”). Relying principally on affidavits

 submitted by the plaintiffs, the Court explained that public school teachers

 were promised career status protections in exchange for
 meeting the requirements of the law, relied on this promise
 in exchange for accepting their teacher positions and
 continuing their employment with their school districts,
 and consider the benefits and protections of career status
 to offset the low wages of public school teachers.

 Id. at 789–90. Thus, “although the Career Status Law itself created no vested

 contractual rights, the contracts between the local school boards and teachers with
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 approved career status included the Career Status Law as an implied term upon

 which teachers relied.” Id. at 790.

¶ 44 The Court then examined the two remaining prongs of the U.S. Trust test.

 Because the law repealing career status eliminated protections that had previously

 been afforded to the teachers under the Career Status Law, the Court had no trouble

 concluding that repeal of the law effected “a substantial impairment of the bargained-

 for benefit promised to the teachers who have already achieved career status.” Id.

 Addressing the third prong—whether the impairment was “reasonable and

 necessary”—the Court explained that the burden shifted back to the State to “justify

 an otherwise unconstitutional impairment of contract” in light of “the interest the

 State argues is furthered.” Id. at 791. Although the Court agreed with the State that

 “maintaining the quality of the public school system is an important purpose . . . [and]

 that alleviating difficulties in dismissing ineffective teachers might be a legitimate

 end justifying changes to the Career Status Law, no evidence indicates that such a

 problem existed.” Id. Furthermore, the Court could not discern how retroactively

 repealing career status for all teachers who had already earned it was a “reasonable”

 way of advancing the State’s asserted interest in light of “several alternatives . . . that

 would allow school boards more flexibility in dismissing low-quality teachers.” Id. at

 792. Accordingly, the Court held that the repeal of the Career Status Law was

 unconstitutional as applied to teachers who had entered into contracts with school
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 boards which granted them career status protections. Id.

 B. Whether a contractual obligation is present.

¶ 45 The facts regarding the language chosen by the General Assembly in the

 statutes creating the State Health Plan, and the language regarding the plan utilized

 by the State and its agents in communications with employees, retirees, and the

 public, are not in dispute. The sole question before us in resolving this issue is a legal

 one: the facts being what they are, do state employees have a vested right in lifetime

 enrollment in a premium-free health insurance plan offering coverage that is of

 equivalent or greater value than the plan offered at the time they became eligible to

 enroll in the State Health Plan on a noncontributory basis? We conclude that they do.

¶ 46 As our precedents illustrate, a state employee can prove the existence of a

 vested right in numerous ways. An employee can show that the statute conferring a

 benefit is itself the source of the right. Generally, proving that the statute is itself the

 source of a right requires an employee to point to language in the statute plainly

 evincing the General Assembly’s intent to undertake a contractual obligation. Based

 on the uncontested facts, we agree with the State that the Establishing Act is not

 itself the source of the Retirees’ contractual right. The Establishing Act declares that

 the State “undertakes to make available a Comprehensive Major Medical Plan . . . to

 employees, retired employees, and certain of their dependents,” but it stipulates that

 the State “will pay benefits in accordance with the terms hereof.” Act of June 23, 1982,
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 ch. 1398 § 6, 1981 N.C. Sess. Laws (Reg. Sess. 1982) at 292 (emphases added)

 (enacting N.C.G.S. § 135-40 (1982), repealed by S.L. 2008-168 § 3(b), 2007 N.C. Sess.

 Laws. (Reg. Sess. 2008) 649, 661)). In addition, the Establishing Act contains a “right-

 to-amend” clause which expressly reserves to the General Assembly the authority to

 change the “terms” of coverage. Id. Accordingly, the Establishing Act does not

 expressly indicate an intent to create a contractual obligation to provide health

 insurance coverage of a certain value.

¶ 47 But state employees can also prove the existence of a vested right by

 demonstrating that they reasonably relied upon the promise of benefits provided by

 a statute when entering into an employment contract with the State. See, e.g., Bailey,

 348 N.C. at 145. If a statute provides benefits in the form of immediate compensation

 deferred until retirement, then the employee’s right to the benefit vests when the

 contract is formed. Cf. NCAE, 368 N.C. at 788 (“Though the benefits would be

 received at a later time, the plaintiffs’ right to receive them accrued immediately,

 became vested, and a contract was formed between the plaintiffs and the State.”

 (citing Bailey and Faulkenbury)). By contrast, if a statute provides benefits for which

 an employee only becomes eligible after certain conditions are met, then the

 employee’s right to the benefit vests when he or she satisfies the relevant eligibility

 criteria. Id. at 788–89.

¶ 48 The Court of Appeals went awry in three important ways when interpreting
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

and applying our Contracts Clause precedents. First, as detailed above, the Court of

Appeals ignored our cases recognizing that vested rights can arise even in the absence

of a statute demonstrating the General Assembly’s express intent to undertake a

contractual obligation. As NCAE illustrates, vested rights may arise from a source

other than an express statutory provision even in circumstances involving benefits

that are not pensions. Second, the Court of Appeals overstated the importance of the

distinction between pension benefits and other kinds of retirement benefits. Although

it is relevant that some of the factors which have led this Court to recognize pension

benefits as vested rights are not present with regard to lifetime enrollment in a

premium-free health insurance plan, these distinctions do not preclude a finding that

public employees obtained a vested right to the latter.6 Third, the Court of Appeals

was wrong to disregard the Retirees’ extrinsic evidence regarding the State’s

communications about the health insurance benefit and what employees reasonably

understood that benefit to be. On a different set of facts in which a statute providing

benefits unambiguously disclaimed any intent to provide any benefits that could be

 6 For example, it is correct that public employees are required to contribute to and

enroll in the pension system but that they can opt out of health insurance coverage.
Regardless, even if an employee does not choose to enroll in the State Health Plan, the
availability of such a plan to an employee—and the employee’s lifetime eligibility to become
a plan member—confers a material benefit which could reasonably influence an individual’s
decision to accept or remain in employment with the State.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 incorporated into the terms of a contract,7 the importance of the State’s subsequent

 communications with employees might be diminished. But we are not presented with

 such a circumstance in this case.

¶ 49 Here, the undisputed evidence establishes that, as the trial court found, “[t]he

 [State] offered [the Retirees] certain premium-free health insurance benefits in their

 retirement if they worked for the State . . . for a requisite period of time” and that the

 “promise” of this benefit was “part of the overall compensation package” state

 employees reasonably expected to receive in return for their services. The undisputed

 evidence

 reveals that often the [benefit of lifetime eligibility for
 premium-free health insurance] was communicated to
 prospective employees with the intent of inducing
 individuals to either begin or continue public service
 employment. Moreover, . . . innumerable communications
 were made to plaintiff public employees throughout their
 careers, both orally and in writing (including multiple
 unequivocal written statements in official publications and

 7 Notably, the General Assembly has enacted statutes containing right-to-amend
 provisions which explicitly and unmistakably stated that any benefits provided by statute
 would not be contractual in nature. See N.C.G.S. § 135-113 (2021) (“The benefits provided in
 this Article as applicable to a participant who is not a beneficiary under the provisions of this
 Article shall not be considered as a part of an employment contract, either written or implied,
 and the General Assembly reserves the right at any time and from time to time to modify,
 amend in whole or in part or repeal the provisions of this Article.”); see also N.C.G.S. § 128-
 38.10(j) (2021) (“The General Assembly reserves the right at any time and, from time to time,
 to modify or amend, in whole or in part, any or all of the provisions of the QEBA. No member
 of the Retirement System and no beneficiary of such a member shall be deemed to have
 acquired any vested right to a supplemental payment under this section.”). The fact that the
 legislature chose not to include this kind of explicit clause in the right-to-amend provision at
 issue here is further support for the conclusion that the Retirees reasonably relied on the
 State’s promise of retirement health insurance coverage.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 employee handbooks) [regarding the availability of the
 benefit]. . . .

 Bailey, 348 N.C. at 138. The undisputed evidence demonstrates that this benefit was

 an important component of state employees’ acceptance of and continuation in

 employment with the State. NCAE, 368 N.C. at 789. These undisputed facts are

 sufficient to establish the legal proposition that a vested right arose from employees’

 reasonable “expectational interests” and their actions in reliance thereon. Bailey, 348

 N.C. at 145.

¶ 50 For example, multiple class members testified to the impact the promise of

 retirement health insurance coverage had on their decision to accept employment

 with and continue working for the State. As we explained in NCAE, such evidence

 can “demonstrate[ ] the importance of those protections to the parties and the

 [employees’] reliance upon those benefits in deciding to take [public] employment.”

 368 N.C. at 789. The State does not meaningfully dispute the fact that class members

 understood the promise of eligibility to enroll in health care after retirement to be a

 benefit they earned through their service to the State—indeed, multiple of the

 defendants or their agents agreed in deposition testimony that they understood

 themselves to have “vested in the retiree health benefit.” This undisputed evidence

 establishes that the promise of health insurance coverage in retirement was “an

 implied term upon which [the employees] relied.” Id. at 790.

¶ 51 Of course, one party’s reliance does not give rise to a contractual obligation if
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 their reliance is unreasonable. But, in this case, undisputed evidence illustrates that

 all parties understood the State to have undertaken an obligation to provide

 continued premium-free health insurance coverage to retirees who had satisfied the

 statutory eligibility requirements.8 While this evidence does not prove that the

 General Assembly acted with an express intent to contract, it demonstrates the

 reasonableness of the Retirees’ belief that lifetime eligibility for enrollment in a

 premium-free health insurance plan was an inducement to employment and a part of

 their overall compensation package.

¶ 52 The short title of the final version of the 2006 bill requiring retired employees

 to have worked for the State for at least twenty years before becoming eligible for

 noncontributory retirement health insurance benefits was “State Health Plan / 20-

 Year Vesting.” S.837 (3d ed.), S.L. 2006-174, § 1, 2005 N.C. Sess. Laws (Reg. Sess.

 2006) at 630 (emphasis added). An actuarial study commissioned by the General

 Assembly to analyze the fiscal impact of changing the service requirement stated that

 8 Although the question of whether a party’s reliance is reasonable “is ordinarily a

 question of fact,” Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C. 534, 544 (1987), the question
 of whether there exists a “genuine issue of material fact” with respect to the reasonableness
 of a party’s reliance is a “question[ ] of law,” Ellis v. Williams, 319 N.C. 413, 415 (1987)
 (emphasis added). Thus, we have on numerous prior occasions recognized that the question
 of whether a party’s reliance has been “established as a matter of law” to be reasonable can
 be resolved on a party’s appeal from a summary judgment order when the underlying
 material facts are undisputed. Cummings v. Carroll, 866 S.E.2d 675, 2021-NCSC-147, ¶ 38;
 see also Ussery v. Branch Banking & Tr. Co., 368 N.C. 325, 336 (2015) (concluding on review
 of summary judgment order that debtor “cannot . . . claim he reasonably relied on” creditor’s
 representation, and citing Court of Appeals decision for proposition that a party’s reliance
 can be “unreasonable as a matter of law”).
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 “current non-contributory premiums paid on behalf of current retirees . . . will

 continue to be a State obligation for some time until these retirees exit the Plan.” Staff

 of N.C. Gen. Assembly Fiscal Rsch. Div., Legislative Actuarial Note on S. 837 (2d ed.):

 State Health Plan / 20-Year Vesting, 2005 Sess. (Reg. Sess. 2006) (June 30, 2006) at

 3 (emphasis added). The fiscal note further explained that the bill increasing the

 minimum number of years of service “requires its application to be prospective” and

 reiterated that the State would still have an “obligation” to pay the premiums of

 retirees and current employees who had already vested. Id. (emphasis added). This

 legislative history, including the General Assembly’s frequent use of the terms

 “vested” and “obligation” in reference to its future payment of retirees’ health

 insurance premiums, is further support for the proposition that the Retirees have

 demonstrated that they and the State shared a common understanding of what this

 benefit represented.

¶ 53 Indeed, on numerous occasions, State officials and agents involved in

 administering retirement benefits told State employees they could rely on the

 promise of health insurance coverage in retirement. In press releases, benefits

 booklets, and training materials, the State conveyed to its employees that after

 completing the applicable service eligibility requirements they would be entitled to

 health insurance coverage “for life.” Customer service personnel were instructed that

 “[i]n order for the retiree to have paid health insurance, he [or she] must have 5 years
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 of contributing membership in the State System, and be in receipt of a monthly

 retirement benefit with the State. . . . With growing concern about health insurance

 in our society today, this is an important piece of information that the member should

 know if he [or she] is vested . . . .” Again, the State does not dispute the existence of

 these materials or the words they contained. As this evidence makes clear, the State

 believed it had undertaken an ongoing commitment to provide health insurance

 benefits to retired employees who had satisfied eligibility requirements and,

 frequently and in numerous ways, communicated that fact to its employees; it is not

 unreasonable for these employees to have taken the State at its word.

¶ 54 For years, employees entering into public employment “relie[d] on” the State’s

 promise of future health insurance benefits. Bailey, 348 N.C. at 144. Prior cases

 recognizing that this kind of reliance gives rise to vested rights are, like this case,

 “rooted in the protection of expectational interests upon which individuals have relied

 through their actions.” Id. at 145. “The statutory system that was in the background

 of the contract between” the Retirees and the State “set out the mechanism through

 which the [employees] could obtain” the health insurance benefit. NCAE, 368 N.C. at

 789. Once state employees met the applicable statutory eligibility requirements and

 became eligible to enroll in a noncontributory health insurance plan, their right

 vested to enroll in a plan offering equivalent or greater value to the one offered to

 them at the time the contract was formed. Accordingly, we overrule the Court of
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 Appeals’ determination that the Retirees had failed to prove the existence of a vested

 right subject to protection by the Contracts Clause.

 C. Whether the contract was substantially impaired.

¶ 55 The trial court’s sole legal conclusion addressing the second prong of the U.S.

 Trust test was its determination that “[t]he [State] substantially impaired the

 contracts with the [Retirees].” The Court of Appeals did not reach this prong because

 it held that the Retirees possessed no vested right to health insurance benefits upon

 retirement which the State could unconstitutionally impair. Regardless, in reviewing

 the trial court’s order resolving the parties’ competing motions for summary

 judgment, we review de novo the trial court’s findings of fact and conclusions of law

 addressing this issue. Forbis, 361 N.C. at 523–24.

¶ 56 At the outset, we reject the State’s argument that the existence of the right-to-

 amend provision in the Establishing Act automatically negates the Retirees’

 argument that the 2011 Act substantially impaired their vested rights. This

 argument suggests that because the General Assembly reserved the right to make

 (and regularly has made) changes to the terms of the health insurance plans available

 to retirees, any such changes are necessarily consistent with the Retirees’ “objectively

 reasonable reliance interests.” The absurdity of this argument is apparent if taken to

 its logical conclusion. Under the State’s reasoning, the General Assembly would not

 substantially impair the Retirees’ vested rights as long as the legislature continued
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 offering a premium-free 80/20 PPO Plan, even if the State imposed a $1 million copay

 for covered services or a similarly exorbitant deductible. Yet obviously, under these

 circumstances the Retirees would rightly perceive that they were being denied the

 benefit of their bargain. Their vested right is more than just the right to enroll in a

 health insurance plan: this right has a substantive component relating to the value

 of the plans being offered by the State.

¶ 57 Nonetheless, recognizing that the Retirees’ vested rights have a substantive

 component does not resolve whether those rights were substantially impaired. To

 answer that question, the Retirees needed to (1) demonstrate a method for objectively

 determining the value of a health insurance plan, one that accounted for the

 numerous variables influencing the “value” of a health insurance plan to a plan

 member; (2) establish the baseline value of the health insurance plan offered to each

 Retiree when his or her right to retirement health insurance benefits vested; and

 (3) show that the plans currently offered by the State are substantially less valuable

 than those baseline plans. We agree with the State that the trial court erred in

 resolving these issues on summary judgment.

¶ 58 The trial court entered three findings of fact of particular relevance to its

 conclusion that the 2011 Act substantially impaired the Retirees’ vested rights:

 27. The currently offered 80/20 “Enhanced” Plan (formerly
 called the standard plan) [i.e., the 80/20 PPO Plan] was
 the continuation of the primary “regular state health
 plan” [i.e., the Major Medical Plan] that had been
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 offered premium-free from 1982 until August 31, 2011.

 ....

 29. The most appropriate way to measure the value of a
 health plan received by a member of that plan and to
 compare the value between offered plans is through the
 calculation and use of a plan’s actuarial value. Through
 the use of actuarial values, it can be determined
 whether a given plan is equivalent to another plan or
 not – the effective actuarial equivalency (hereinafter
 such calculation methodology referred to as
 “Equivalent”).

 ....

 31. The health plan(s) offered by the State Health Plan at
 the 70/30 level and referred to by the State Health Plan
 as the “Basic” and “Traditional” Plans from 2011-2016
 is of a lesser value than the 80/20 Standard Plan and
 was not and is not Equivalent to the 80/20 Standard
 Plan.

 Contrary to the trial court’s characterization of these findings as “[u]ndisputed,” each

 was and remains vigorously contested. The State disagrees that the 80/20 PPO Plan

 is the continuation of the Major Medical Plan, disputes the validity of the “actuarial

 equivalency” method for determining the relative value of different health insurance

 plans, and asserts that “the State has always offered plaintiffs a health plan with an

 actuarial value” “that mirrors the Major Medical Plan.” There is evidence in the

 record to support both parties’ positions on each of these determinative issues.

¶ 59 The “facts alleged” by the State “are of such nature as to affect the result of the

 action,” and “question[s] as to . . . the weight of evidence” have been brought forth by
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 the parties. Kessing v. Nat’l Mortg. Corp., 278 N.C. 523, 535 (1971). For example, the

 State argued at summary judgment that the evidence showed that “over 75% of

 retirees who are enrolled in the State Health Plan are eligible for Medicare” and that

 for those individuals, the cost difference between the 70/30 and 80/20 PPO Plans is

 just “slightly over $3 per month.” Thus, the State contends that even after 2011 the

 Retirees could remain in a premium-free health insurance plan providing essentially

 the same or greater value as the plan offered to them when their rights vested. The

 State also presented evidence disputing the Retirees’ assertion that a sizeable portion

 of the class was paying premiums as high as $100 per month to maintain their

 coverage.

¶ 60 At the same time, the Retirees have offered evidence that supports the

 conclusion that their rights were substantially impaired, including that the plans

 currently offered cost members, on average, an additional $400 per year, and that the

 total impairment to the Retirees’ contractual rights may exceed $100 million in back

 premiums. Thus, there are “genuine issues [of] . . . material fact” with respect to the

 second prong of the U.S. Trust test, and these issues are “triable.” N.C Nat’l Bank v.

 Gillespie, 291 N.C. 303, 310 (1976). Although some of the material evidence is

 undisputed, the parties do not agree on the central questions of how to value health

 insurance plans and whether the health insurance plans offered to retirees after the

 effective date of the 2011 Act are comparable to or of substantially lesser value than
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 the plans they bargained for. Accordingly, “summary judgment was improperly

 granted.” N.C. Farm Bureau Mut. Ins. Co. v. Sadler, 365 N.C. 178, 182 (2011).

¶ 61 Moreover, we note that even if the trial court’s findings had been undisputed,

 the findings would be inadequate to support the conclusion that there was a

 substantial impairment. The trial court largely based its conclusion that the State

 substantially impaired class members’ contracts on its finding that “[t]he health

 plan[s] offered by the State Health Plan at the 70/30 level . . . is of a lesser value than

 the 80/20 Standard Plan and was not and is not Equivalent to the 80/20 Standard

 Plan.” But, in addition to finding that the value of a vested right has been diminished,

 the trial court also needed to determine the magnitude of the decline in value in order

 to ascertain whether any impairment was “substantial.” As we explained in Bailey,

 “[w]hen examining whether a contract has been unconstitutionally impaired, the

 ‘inquiry must be whether the state law has, in fact, operated as a substantial

 impairment of a contractual relationship. . . . Minimal alteration of contractual

 obligations may end the inquiry at [this] stage.’ ” Bailey, 348 N.C. at 151 (alterations

 in original) (quoting Allied Structural Steel Co., 438 U.S. at 244–45 (footnote

 omitted)).9 Given the complexities inherent in determining the comparative value of

 9 In assessing whether an impairment is minimal or substantial, courts may consider

 the “overall impact” of the impairment when measured in the aggregate provided they do so
 in the context of the size of the class. Bailey v. State, 348 N.C. 130 (1998). For example, the
 $100 million impairment at issue in Bailey would likely not have established the existence of
 a “substantial” impairment if the class had been comprised of one hundred million people.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 different health insurance plans, it was not self-evident that eliminating the

 premium-free 80/20 PPO Plan while maintaining the premium-free 70/30 PPO Plan

 worked a substantial impairment.

¶ 62 Further, the parties agreed to defer consideration of the extent of damages, but

 that evidence may be relevant to whether the contractual impairment was

 substantial. Different class members vested at different times, and the terms of the

 Major Medical Plan and the PPO plans the State began offering later have changed

 over time. These evolutions matter in the Contracts Clause analysis—the terms of

 the plan offered when each class member vested establish the baseline value of what

 each individual bargained for. Yet the trial court’s findings do not address these

 nuances, and the evidence at summary judgment indicates that the value of the

 benefits the Retirees could expect at the time they vested remains hotly contested. It

 may be that the Retirees can obviate the need to engage with these complexities by

 proving that all of the noncontributory plans offered to class members who vested

 before 2011 were more valuable than any of the noncontributory plans offered to class

 members today—or, vice versa, that the State can prevail by proving that the value

 of a noncontributory plan offered to every class member today is equivalent to or more

 generous than the most valuable noncontributory plan available to all class members

 when they vested. But neither side has met its burden of doing so on summary

 judgment. This information is actually disputed and is crucial to measuring whether
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 there was an impairment and, if so, whether the impairment was substantial.

¶ 63 The trial court’s determination that there was a substantial impairment of the

 Retirees’ contracts was based on an overly simplified characterization of what the

 Retirees were entitled to when they vested and what they were receiving after the

 2011 Act took effect. The trial court’s order masks important disputes of material fact

 that must be resolved before a decision on liability can be made. In Simpson this

 Court held that the plaintiffs “had a contractual right to rely on the terms of the

 retirement plan as these terms existed at the moment their retirement rights became

 vested.” 88 N.C. App. at 224. In Faulkenbury, we explained further that the plaintiffs

 “expected to receive what they were promised at the time of vesting. They may not

 have known the exact amount, but this was their expectation. The contract was

 substantially impaired when the promised amount was taken from them.” 345 N.C.

 at 692–93. Therefore, the crucial factual matters relevant to this issue are the value

 of the plan in which the Retirees were vested and the value of what was offered to

 them after the 2011 Act took effect. While it is understandable that the parties and

 the trial court were not eager to wrestle with the factually complex assessment of

 which class members suffered what damages, in this case that assessment of

 damages may be crucial to determining whether, in fact, the impairment of the state

 employees’ contract was substantial and thus constitutionally salient.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 D. Whether the impairment was reasonable and necessary.

¶ 64 If the trial court determines that the 2011 Act substantially impaired the

 Retirees’ contractual rights, the final question is whether the impairment was “a

 reasonable and necessary means of serving a legitimate public purpose.” NCAE, 368

 N.C. at 791. “This portion of the inquiry involves a two-step process, first identifying

 the actual harm the state seeks to cure, then considering whether the remedial

 measure adopted by the state is both a reasonable and necessary means of addressing

 that purpose.” Id. (citing Energy Rsrvs. Grp. v. Kan. Power & Light Co., 459 U.S. 400,

 412 (1983)). At this stage of the analysis, “[t]he burden is upon the State . . . to justify

 an otherwise unconstitutional impairment of contract.” Id. (citing U.S. Trust, 431

 U.S. at 31).

¶ 65 In its order granting the Retirees’ partial motion for summary judgment, the

 trial court found that the State’s impairment “was neither reasonable nor necessary

 to serve an important public purpose.” However, underlying this determination are

 genuine disputes about material facts which require further development at trial. In

 particular, should it need to reach this question on remand, the trial court must

 closely examine the State’s asserted interest in avoiding an “estimated thirty-five

 billion dollars in unfunded future outlays” and the Retirees’ rejoinder that “there

 were a multitude of methods to stabilize the State Health Plan without impairing

 vested rights.”
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

¶ 66 Although answering this question primarily requires resolving disputed issues

 of fact, certain applicable legal principles can be discerned from our case law. First,

 the existence of the problem the State asserts it seeks to address by impairing a

 contract cannot be assumed. Instead, the State must present “evidence [which]

 indicates that such a problem existed.” Id. Second, the State’s interest in not

 expending resources is not, standing alone, sufficient to render an impairment

 reasonable. Many contracts commit a party to expending resources in the future, even

 if the party would prefer not to when the time comes to pay; the party’s obligation to

 do so anyway makes it a contract. The fact that disallowing an impairment might

 require the General Assembly to make difficult choices regarding how to allocate

 resources to best manage its fiscal obligations does not necessarily justify abrogating

 the legislature’s contractual obligations. Bailey, 348 N.C. at 152. Similarly, the fact

 that certain trends have caused an increase in the State’s cost of maintaining the

 promised benefits does not, on its own, justify an impairment. See Faulkenbury, 345

 N.C. at 694 (“We do not believe that because the pension plan has developed in some

 ways that were not anticipated when the contract was made, the state or local

 government is justified in abrogating it.”). Finally, the State “is not free to impose a

 drastic impairment when an evident and more moderate course would serve its

 purposes equally well.” U.S. Trust, 431 U.S. at 31. The existence of “alternative[ ]”

 methods of advancing the State’s asserted interest other than imposing an
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 impairment tends to detract from the State’s contention that the impairment is

 necessary. NCAE, 368 N.C. at 792. At the same time, we recognize that “the

 [e]conomic interest of the state may justify . . . interference with contracts,” Home

 Bldg. & Loan Ass’n, 290 U.S. at 437, and that the State always retains the authority

 to act to protect the public should it be faced with a grievous fiscal emergency. On

 remand, these principles should guide the trial court’s effort to ascertain whether any

 impairment of the Retirees’ rights, if proved, was “reasonable and necessary” and

 thus permissible under the Contracts Clause.

 IV. The State Law of the Land Clause Claim

¶ 67 In addition to their Contracts Clause claim, the Retirees also alleged that the

 2011 Act constituted an impermissible taking of private property in violation of

 article I, section 19 of the North Carolina Constitution. The trial court agreed,

 concluding that “[i]mposing premiums on the 80/20 Standard Plan . . . constituted a

 ‘taking’ under state law of Class Members’ private property by restricting and/or

 eliminating Class Members’ contractual right to the non-contributory 80/20 Standard

 plan and reducing a vested retirement benefit.” The Court of Appeals reversed based

 on its conclusion that the Retirees had failed to demonstrate the existence of any

 rights implicated by the 2011 Act. Lake, 264 N.C. App. at 188.

¶ 68 The Law of the Land Clause of the North Carolina Constitution guarantees in

 relevant part that “[n]o person shall be . . . in any manner deprived of his . . . property,
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 but by the law of the land.” N.C. Const. art. I, § 19. As the Court of Appeals correctly

 explained, “[a] contractual right is a property right, and the impairment of a valid

 contract is an impermissible taking of property.” Lake, 264 N.C. App. at 188; see also

 Bailey, 348 N.C. at 154 (“[V]alid contracts are property . . . .” (quoting Lynch v. United

 States, 292 U.S. 571, 579 (1934))). Thus, in holding that the Retirees do have a vested

 right in retirement health insurance coverage, we necessarily overrule the Court of

 Appeals’ conclusion that the Retirees lack a colorable state constitutional claim. Of

 course, even if there is a property right, there can be no constitutionally

 impermissible taking if there is no taking. Cf. Dep’t of Transp. v. Adams Outdoor

 Advert. of Charlotte Ltd. P’ship, 370 N.C. 101, 106 (2017) (“When the State takes

 private property . . . the owner must be justly compensated.”) (cleaned up) (emphasis

 added). Accordingly, on remand, the trial court must reassess the Retirees’ Law of

 the Land Clause claim in light of its resolution of the parties’ dispute regarding the

 value of the noncontributory plans offered by the State to Retirees at various times.

 V. Conclusion

¶ 69 This case raises significant questions relating to the State’s efforts over the

 years to attract and retain talented employees while responsibly managing its fiscal

 obligations. This dispute also raises issues of profound importance to the hundreds of

 thousands of dedicated public employees who devoted their lives to serving their

 fellow North Carolinians, often for less immediate remuneration than would have
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

 been available to them in the private sector. Although our decision in this case does

 not end this controversy, it narrows the issues and, hopefully, moves the parties

 closer to a just resolution.

¶ 70 Today we hold that the Retirees who satisfied the eligibility requirements

 existing at the time they were hired obtained a vested right in remaining eligible to

 enroll in a noncontributory health insurance plan for life. These Retirees reasonably

 relied on the promise of this benefit in choosing to accept employment with the State.

 They are entitled to the benefit of their bargain, which includes eligibility to enroll in

 a premium-free plan offering the same or greater coverage value as the one available

 to them when their rights vested. Nevertheless, we also hold that the trial court erred

 in concluding that the Retirees brought forth undisputed facts demonstrating that

 their vested rights were substantially impaired when the General Assembly

 eliminated the premium-free 80/20 PPO Plan in 2011. In particular, the trial court

 overlooked genuine issues of material fact regarding the proper way to assess the

 relative value of different health insurance plans and potential differences in the

 value of the bargain struck by class members whose rights vested at different times.

 The trial court also erred in entering summary judgment against the State on the

 issue of whether any such impairment was reasonable and necessary.

¶ 71 Accordingly, we overrule the portion of the Court of Appeals decision holding

 that the Retirees lacked any right which triggered the protections of the Contracts
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Opinion of the Court

Clause of the United States Constitution and the Law of the Land Clause of the North

Carolina Constitution. We affirm the decision of the Court Appeals to the extent it

reversed the trial court’s grant of partial summary judgment in the Retirees’ favor,

reverse that court’s decision with respect to its conclusion that the State was entitled

to summary judgment on liability, and remand this action to the trial court for

proceedings not inconsistent with this opinion.

 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

 Chief Justice NEWBY did not participate in the consideration or decision of

this case.
 Justice BARRINGER concurring in part and dissenting in part.

¶ 72 I agree with the majority that we must remand this case for factual

 determinations on whether the State substantially impaired a contract and whether

 such impairment was reasonable and necessary. However, because the evidence in

 the record, when viewed in the light most favorable to the State, creates a genuine

 issue of material fact as to whether any contractual obligation is present, we should

 also remand that issue to the trial court for resolution by the fact-finder. Accordingly,

 I respectfully concur in part and dissent in part.

 Analysis

¶ 73 In determining whether the State has unconstitutionally impaired a contract,

 North Carolina courts follow a three-part test involving “(1) whether a contractual

 obligation is present, (2) whether the state’s actions impaired that contract, and (3)

 whether the impairment was reasonable and necessary to serve an important public

 purpose.” Bailey v. State, 348 N.C. 130, 141 (1998). The trial court granted summary

 judgment in plaintiffs’ favor on all three of these inquiries. The Court of Appeals

 reversed the trial court’s grant of summary judgment, ruling in the State’s favor on

 the first inquiry that no contractual obligation was present. Lake v. State Health Plan

 for Tchrs. & State Emps., 264 N.C. App. 174, 188 (2019). Based on the evidence the

 parties have put forward, I cannot conclude that either court properly resolved, at the

 summary judgment stage, the issue of whether a contractual obligation was present.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 A. Standard of Review

¶ 74 When there is a motion for summary judgment
 pursuant to Rule 56, the court may consider evidence
 consisting of admissions in the pleadings, depositions,
 answers to interrogatories, affidavits, admissions on file,
 oral testimony, and documentary materials. . . . The
 motion shall be allowed and judgment entered when such
 evidence reveals no genuine issue as to any material fact,
 and when the moving party is entitled to a judgment as a
 matter of law.

 An issue is material if the facts alleged would
 constitute a legal defense, or would affect the result of the
 action, or if its resolution would prevent the party against
 whom it is resolved from prevailing in the action. The issue
 is denominated “genuine” if it may be maintained by
 substantial evidence.

 Summary judgment provides a drastic remedy and
 should be cautiously used so that no one will be deprived of
 a trial on a genuine, disputed issue of fact. The moving
 party has the burden of clearly establishing the lack of
 triable issue, and his papers are carefully scrutinized and
 those of the opposing party are indulgently regarded.

 Koontz v. City of Winston-Salem, 280 N.C. 513, 518 (1972); see also N.C. R. Civ. P.

 56(c).

¶ 75 “This Court reviews appeals from summary judgment de novo.” Ussery v.

 Branch Banking & Tr. Co., 368 N.C. 325, 334–35 (2015). “When considering a motion

 for summary judgment, the trial judge must view the presented evidence in a light

 most favorable to the nonmoving party.” Dalton v. Camp, 353 N.C. 647, 651 (2001).

 “[I]f a review of the record leads the appellate court to conclude that the trial judge
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 was resolving material issues of fact rather than deciding whether they existed, the

 entry of summary judgment is held erroneous.” Alford v. Shaw, 327 N.C. 526, 539

 (1990).

 B. Whether a contractual obligation is present

¶ 76 I agree with the majority that the statute does not expressly indicate an intent

 to create a contractual obligation. Yet, under our past precedent, plaintiffs can still

 establish that a contractual obligation is present if plaintiffs demonstrate that they

 reasonably relied upon the promise of retirement benefits provided by statute in

 entering into or continuing employment with the State. Bailey, 348 N.C. at 145.

 However, plaintiffs’ reliance must have been reasonable, and reasonableness is a

 question of fact. Id. at 146; see also Olivetti Corp. v. Ames Bus. Sys., Inc., 319 N.C.

 534, 544 (1987) (“Ordinarily, the question of whether an actor is reasonable in relying

 on the representations of another is a matter for the finder of fact.”).

¶ 77 As evidence of the reasonableness of their reliance, plaintiffs primarily point

 to booklets distributed by the North Carolina Retirement System. However, multiple

 booklets contained explicit disclaimers, in boldface type, on the first page that stated:

 DISCLAIMER: The availability and amount of all
 benefits you might be eligible to receive is governed by
 Retirement System law. The information provided in this
 handbook cannot alter, modify or otherwise change the
 controlling Retirement System law or other governing legal
 documents in any way, nor can any right accrue to you by
 reason of any information provided or omission of
 information provided herein. In the event of a conflict
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 between this information and Retirement System law,
 Retirement System law governs.

 (Emphasis added.) Recent booklets, like the one dated 2009, described themselves as

 “summariz[ing] the benefits available to [employees] as a member of the retirement

 system, including: [b]enefits [employees] will receive at retirement once [they] meet

 the service and age requirements . . . .]” The 2009 booklet further explained that a

 public employee in North Carolina was part of a “defined benefit plan,” meaning that

 when a public employee retired the employee’s “life long benefits [we]re guaranteed

 and protected by the Constitution of the State of North Carolina.” The booklets also

 indicated that after satisfying certain criteria an employee became “vested in the

 Retirement System,” making that employee “eligible to apply to lifetime monthly

 retirement benefits.” This emphatic language, however, was referring to Retirement

 System benefits in general, as opposed to the State Health Plan.

¶ 78 When discussing the State Health Plan for retirees, the booklets used different

 language. The booklets stated only that employees “may also be eligible for retiree

 health coverage as described on page 20.” (Emphasis added.) On page 20, the booklets

 stated:

 When you retire, you are eligible to enroll in the
 State Health Plan, with the costs determined by when you
 began employment and which health coverage you select,
 if you contributed to the Teachers’ and State Employees’
 Retirement System for at least five years . . . while
 employed as a teacher or State employee.
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 At the time you complete your retirement
 application, be sure to complete an application to enroll in
 the retiree group of the State Health Plan.

 Under current law, if you were first hired prior to
 October 1, 2006, and retire with five or more years of State
 System membership service, the State will pay either all or
 most of the cost, depending on the plan chosen, for your
 individual coverage under one of the Preferred Provider
 Organization (PPO) plans. . . .

 (Emphasis omitted.) Accordingly, the description of benefits was expressly recognized

 as conditional and further conditioned as representing the state of health benefits as

 they existed “[u]nder current law.” In addition, the booklets described pensions as

 “continu[ing] for the rest of [one’s] life” and “vested” but did not use the same

 language to describe health benefits.

¶ 79 Similarly, in older booklets, the language used to describe retirement benefits

 was not the same as the language used to describe retiree health insurance. The 1988

 retirement booklet did not mention the State Health Plan until the very last section,

 labeled “Remember,” which also discussed programs like Social Security and

 Medicare. Specifically, the booklet stated, “When you retire, if you have at least 5

 years of service as a contributing teacher or State employee, you are eligible for

 coverage under the State’s Comprehensive Major Medical Plan with the State

 contributing toward the cost of your coverage.” (Emphasis omitted.)

¶ 80 Furthermore, the booklets distributed by the State Health Plan to employees

 explicitly stated on the first or second page that “[t]he North Carolina General
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 Assembly determines benefits for the State Health Plan and has the authority to

 change benefits.” The 1983 booklet warned that “[s]ince the Plan was established by

 law, benefits and policies can be changed only through new legislation.” The 1986

 booklet cautioned that “the level of benefits and claims service have varied from time

 to time” and that “[g]iven the continued rise in health care costs and utilization (some

 12% to 14% a year in this plan alone!) further benefit changes may be necessary.” The

 2004 booklet included a boldface type section which stated that the “Benefits for the

 North Carolina Teachers’ and State Employees’ Comprehensive Major Medical Plan

 are based upon legislation enacted by the North Carolina General Assembly.” Finally,

 the booklets repeatedly noted that “[i]f any information in [the booklets] conflict[ed]

 with . . . the General Statutes . . . the General Statutes . . . w[ould] prevail.”

¶ 81 As for the General Statutes, one section contains language noting that the

 State “undertakes to make available a State Health Plan . . . for the benefit of . . .

 eligible retired employees,” but that statement is modified in the same sentence with

 a clause explaining that the plan “will pay benefits in accordance with the terms of

 this Article.” N.C.G.S. § 135-48.2(a) (2021). The very next section of the statute

 contains an explicit disclaimer that the terms of the article are subject to alteration

 and termination, stating, “The General Assembly reserves the right to alter, amend,

 or repeal this Article.” N.C.G.S. § 135-48.3 (2021).

¶ 82 While under our precedent the presence of a right-to-amend provision does not
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 necessarily prevent a contractual obligation from arising from a statute, see Simpson

 v. N.C. Loc. Gov’t Emps.’ Ret. Sys., 88 N.C. App. 218, 221, 223–24 (1987), aff’d per

 curiam, 323 N.C. 362 (1988), a right-to-amend provision is relevant to the plaintiffs’

 reasonable reliance. As the Supreme Court of the United States has observed,

 reserving the “rights to repeal, alter, or amend, [an a]ct at any time” is “hardly the

 language of a contract.” Nat’l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe

 Ry. Co., 470 U.S. 451, 467 (1985) (cleaned up).

¶ 83 Further, not only did the General Assembly explicitly reserve the right to alter,

 amend, or repeal the State Health Plan, the undisputed evidence in the record reveals

 that the General Assembly frequently exercised this amendment power. Since the

 inception of the State Health Plan, the State has regularly amended it, raising

 coinsurance amounts from 5% to 10% to 20%, increasing the deductible from $100 to

 $150 to $250 to $350 to $450, and enlarging the out-of-pocket maximum from $100 to

 $300 to $1,000 to $1,500 to $2,000. In the twenty-nine years between 1982 and 2011,

 the record reflects that the General Assembly passed at least twenty-nine bills

 amending the State Health Plan, making almost two hundred individual changes.

¶ 84 In short, when plaintiffs’ evidence is “carefully scrutinized” and the State’s

 evidence is “indulgently regarded,” Koontz, 280 N.C. at 518, and when all inferences

 are drawn in the light most favorable to the State, Dalton, 353 N.C. at 651, there is

 a genuine issue of material fact as to plaintiffs’ reasonable reliance. The record does
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 not evidence “multiple unequivocal written statements in official publications and

 employee handbooks” promising plaintiffs lifetime noncontributory health insurance

 in exchange for their public service as state employees. Bailey, 348 N.C. at 138, 146.

 While certainly some materials supporting plaintiffs’ position exist, plaintiffs must

 also admit the existence of other materials that directly contradict the reasonableness

 of their reliance. When the entirety of the record is viewed in the light most favorable

 to the State, the right-to-amend provision, the disclaimers in the booklets, and the

 constant statutory changes are substantial evidence that could support a finding that

 plaintiffs did not reasonably rely on a promise of health benefits provided by statute

 in entering into or continuing employment with the State.

¶ 85 Additionally, as part of the determination of whether a contractual obligation

 exists, the fact-finder must also determine what the terms of a contractual obligation

 produced by plaintiffs reasonable reliance would be. On appeal, the plaintiffs asked

 this Court to reinstate the term of the contractual obligation found by the trial court;

 namely, a contract for “the 80/20 ‘Enhanced’ Plan (as offered by the State Health Plan

 in September 2011), or its Equivalent, premium-free to all non-Medicare-eligible

 Class Members for the duration of their retirements.” The majority, however, now

 recognizes a different contractual obligation, one that requires the State to provide a

 health plan of “equivalent or greater value to the one offered” at the time each

 individual plaintiff “met the applicable statutory eligibility requirements and became
 LAKE V. STATE HEALTH PLAN

 2022-NCSC-22

 Barringer, J., concurring in part and dissenting in part

 eligible to enroll in a noncontributory health insurance plan.” Yet for the entirety of

 the State Health Plan’s thirty-year existence, retirees have never received a health

 plan at a locked-in, unchanging value. Rather, retirees received whatever plan the

 State was then offering to current employees, which varied from year to year. Given

 this constant variance, the question of what terms would attach to a contractual

 obligation arising out of plaintiffs’ reasonable reliance is also a genuine issue of

 material fact, one that the fact-finder should resolve in this case.

 Conclusion

¶ 86 In adherence to this Court’s admonition that summary judgment should be

 “used cautiously . . . so that no one will be deprived of a trial on a genuine, disputed

 issue of fact,” Koontz, 280 N.C. at 518, I have no choice but to conclude that this case

 should be remanded to the fact-finder. Based on the evidence in the record, the

 question of whether a contractual obligation could have arisen through plaintiffs’

 reasonable reliance and what terms would apply to such a contractual obligation is a

 genuine issue of material fact. Accordingly, I would remand that issue to the trial

 court for further proceedings not inconsistent with this opinion. Otherwise, I concur

 in the majority’s opinion.

 Justice BERGER joins in this concurring in part and dissenting in part

 opinion.